Filed 6/3/25; modified and certified for partial publication 7/3/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCOS ANTONIO JIMENEZ et al.,<br><br>    Defendants and Appellants. | H049356<br>(Santa Clara County<br>Super. Ct. No. 216443) |

A jury convicted defendants Marcos Antonio Jimenez and Marco Antonio Ruiz of murder—finding true a robbery-murder special circumstance—attempted murder, and conspiracy to commit robbery. Defendants appealed, raising multiple claims of instructional error, evidentiary error, and sentencing error. Jimenez further argues that the trial court erred in denying his motion under the California Racial Justice Act of 2020 (Pen. Code, § 745 (RJA)).[1] Finding no reversible error, we affirm the judgments as to both defendants.

## I.     BACKGROUND

### A.     *The Indictment*

In November 2017, the Santa Clara County grand jury indicted both Jimenez and Ruiz on charges of murder (§ 187; count 1) of Humberto Salas with a robbery-murder

_____

[1] Unspecified statutory references are to the Penal Code.

1

special circumstance (§ 190.2, subd. (a)(17)), attempted murder (§§ 664, 187; count 2) of A.P., and conspiracy to commit robbery (§§ 211, 212.5, subd. (c); count 3).  As to both counts 1 and 2, it was alleged that Jimenez personally and intentionally discharged a firearm that caused death (§ 12022.53, subd. (d)) and that Ruiz personally discharged a firearm (§ 12022.53, subd. (c)).

**B.**    ***The Trial***

The prosecution's case largely rested on testimony from S.C., Jimenez's girlfriend and a coparticipant in the crimes, who testified for the prosecution after entering a plea agreement wherein she pleaded guilty to voluntary manslaughter, accessory after the fact, and conspiracy to commit attempted robbery or robbery.  The defense disputed both Jimenez and Ruiz's presence at the scene, and the defense theory was that S.C. was falsely implicating them because she "knew, without question" what the prosecutor wanted to hear so that S.C. could reunite with her child and avoid a life in prison.

**1.  *The Robbery and Murder***

In October 2016, then 19-year-old S.C. was with Ruiz and Jimenez at Dove Hill Park when Ruiz told Jimenez that he needed to make money.  Ruiz suggested finding someone to rob, and he and Jimenez used S.C.'s Instagram account, locating A.P.'s profile.  S.C. knew that A.P., a former classmate, sold marijuana, and she told Jimenez that she thought he could be an easy target.  Ruiz said that he had seen A.P. before and that A.P. "seemed like he was a bitch"—or easily intimidated.

The group planned for S.C. to get inside A.P.'s car on the pretext of buying marijuana.  Afterward, Ruiz, armed with a handgun, would run up to the car and take A.P.'s valuables, with Jimenez on "standby" with his shotgun.  The group planned to commit the robbery at Dove Hill Park, and Ruiz sent A.P. Instagram messages from S.C.'s phone to arrange the meeting.

Preparing for the robbery at the home of S.C.'s mother, Ruiz and Jimenez donned black sweatshirts, gloves, and masks.  The group drove over to the park in Jimenez's car,

2

at one point going toward the side of the park that was next to a school. Ruiz and Jimenez entered the park on foot to wait for A.P.

Before meeting S.C., A.P. picked up his friend, Humberto Salas, then 17 years old, planning to hang out together afterward. A.P. arrived at Dove Hill Park and texted S.C. at around 8:36 p.m. to say he was there.

S.C. approached A.P.'s car and got in the backseat near the middle but toward the driver's side. Salas was in the front passenger seat. A.P. passed S.C. a jar of marijuana. Ruiz and Jimenez then ran up—Ruiz to the driver's side, Jimenez to the back passenger side. With his handgun, Ruiz pistol-whipped A.P. several times and yelled at S.C. to give up her phone.

Jimenez meanwhile had opened the rear passenger door and was leaning into the car, close enough to grab S.C.'s wrist as she held her phone. While Jimenez had his shotgun pointed toward the front passenger seat, where Salas was seated, A.P. started driving away, and S.C., still in the car, heard three or four gunshots.

While driving, A.P. saw that Salas had been shot and started screaming. A.P. pulled over near the freeway, and S.C. left the car. A.P. called 911 at about 8:42 p.m. and reached a nearby hospital five minutes later, but Salas later died.

After leaving A.P.'s car, S.C. went to her mother's house. When she arrived, Jimenez and Ruiz were already there. S.C. told Ruiz and Jimenez about Salas being shot, and Jimenez said that he had accidentally fired his shotgun. S.C. asked Ruiz and Jimenez why they had not warned her they were going to shoot at the car, and Ruiz responded that he had told Jimenez that was his plan.

Jimenez told S.C. he would throw the shotgun shells into the ocean in San Francisco, and he later called her to tell her he had done so. Past midnight on October 20, Jimenez's phone made calls that showed as activating off a cell tower in San Francisco.

In December 2016, S.C., Jimenez, and Ruiz were arrested.

3

### 2. *Forensic Evidence and the Police Investigation*

A hoodie and three gloves—one single glove and one pair—were found stashed in a bush near the park.  At the scene, officers found several projectiles, including four .40-caliber casings, but no shotgun shells or shotgun ammunition.  Inside an apartment on Danze Drive where Ruiz had sometimes been staying around the time of his arrest, officers found .40-caliber ammunition—two full boxes with only one round missing—that had the same headstamp as the casings found at the park.

The four .40-caliber casings found at the scene were from the same source.  Particles consistent with gunshot residue were found on the recovered single glove, the left glove of the recovered pair, and on the black hooded sweatshirt.

Blood found inside of the single glove was a mixture from two individuals, with Ruiz's DNA being consistent with the major contributor.  Jimenez could not be excluded as a contributor to DNA found on the pair of gloves.  A stain on the black hooded sweatshirt found in the bush had DNA consistent with S.C. being a major contributor and with Ruiz, Jimenez, Salas, and A.P. as possible minor contributors.

Officers executed a search warrant on Pinger, an Internet-based messaging application, for records pertaining to Ruiz's phone number and the associated username "marco.ruiz1997."  The Pinger records disclosed that the account sent and received 10 messages between 7:55 p.m. and 8:23 p.m. the day of the shooting.  The number also received a text message at around 9:16 p.m., after the shooting.

Salas was killed by a shotgun wound to his back, fired from a range of approximately three to six feet.  Although the shotgun blast did not strike anything else in the car, there were bullet strikes on the rear quarter panel of the driver's side, a smashed back driver side window, as well as blood on the front passenger seat.  Several bullet fragments were recovered from the vehicle.

Sometime during his police interrogation, Ruiz was left alone while still being recorded.  An officer monitoring the interview room's surveillance video heard Ruiz

saying " 'snitch bitch,' " " 'murder weapon,' " and " 'glove,' " among less intelligible statements.

## C.    *The Verdict*

In January 2020, the jury found Ruiz guilty of all charged counts and further found true the robbery-murder special circumstance and the two firearm allegations. The jury found Jimenez guilty as to all charged counts and found true the robbery-murder special circumstance but found not true the two firearm enhancements alleged as to the murder and attempted murder.

## D.    *Post-Trial Motions and Sentencing*

In July 2021, the trial court sentenced Ruiz to a term of life without the possibility of parole (LWOP) for Salas's murder, consecutive to seven years for the attempted murder of A.P., 20 years for the gun enhancement as to the attempted murder charge, and one year for the conspiracy conviction. The trial court struck under section 1385, subdivision (b)(1) the firearm enhancement as to the murder conviction.

The following month, the trial court denied Jimenez's motion to dismiss the special-circumstance allegation under the RJA, finding that Jimenez failed to make a prima facie showing of discriminatory charging of the special circumstance. The court also rejected Jimenez's claim that a LWOP sentence would constitute cruel or unusual punishment. Although the court opined that Jimenez merited a youthful offender parole hearing, the court declined to address whether he was entitled to one: Jimenez had yet to serve the minimum time that section 3051 requires for consideration for such a parole hearing, and "many things can change, including the law" excluding him from future eligibility. The court then sentenced Jimenez to LWOP for Salas's murder, a concurrent term of seven years for A.P.'s attempted murder, and three years for the conspiracy.

5

## II. DISCUSSION

### A. *Exclusion of Evidence: WiFi Networks at Dove Hill Park*

Given S.C.'s testimony that Ruiz had no cellular phone service when the prosecution evidence showed his Pinger user account was sending and receiving messages, Ruiz sought to introduce testimony from a defense investigator who visited Dove Hill Park during trial and found no accessible public WiFi networks. Reviewing the court's ruling on relevance for abuse of discretion (*People v. Avila* (2006) 38 Cal.4th 491, 578 (*Avila*)), we find no error.

### 1. *Additional Background*

S.C. testified to her belief that Ruiz lacked a working phone at the time of the offense: She understood that his phone could not connect to a cellular service (because he could not pay his phone bills), and she did not believe there was available WiFi at Dove Hill Park. And although Jimenez had a phone, its screen was broken.

But records from Pinger, an Internet-based messaging application, showed that the account of user "marco.ruiz1997" sent and received 10 messages between 7:55 p.m. and 8:23 p.m. the night of the shooting. Transmission of Pinger messages requires a data connection. Pinger is a WiFi-based application that permits users to make voice calls without going through a mobile phone service provider like AT&T or T-Mobile. Pinger messages, according to Detective Brian Meeker, could thus be sent from a phone that is "tethered" to another cellular device that supplied WiFi access. And cell phone records disclosed that Ruiz's phone received a text message at around 9:16 p.m., shortly after the shooting.

Thus, to be able to make and receive calls from Pinger, Ruiz's phone would have had to have been connected to WiFi if he was otherwise unconnected to a cell service. Therefore, to dispute that he was present at the scene, Ruiz sought to admit evidence that in January 2020, his defense investigator visited 17 locations throughout Dove Hill Park and found only WiFi networks that were either locked or unlocked but required logging

6

in for access.  Ruiz's counsel argued that the investigator's findings were circumstantial evidence of an alibi defense:  To the extent the January 2020 unavailability of unsecured WiFi networks in Dove Hill Park tended to suggest that WiFi networks would have been unavailable there over three years earlier, Ruiz could not have been sending and receiving Pinger messages had he been with S.C. at the park at the time.

The trial court excluded the evidence, finding the current WiFi status at the park had "very little probative value" as to "what the WiFi networks were like or existed in October of 2016."  The court also found that its admission would also prejudice the prosecution, given the lack of opportunity to investigate the identified networks and when they had been secured.

### 2.    *Analysis*

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also *People v. Clark* (2011) 52 Cal.4th 846, 892 [relevant evidence " 'tends " 'logically, naturally, and by reasonable inference' to establish material facts" ' "].)  "Any relevant evidence that raises a reasonable doubt as to a defendant's guilt . . . is admissible." (*Avila*, *supra*, 38 Cal.4th at p. 577.)  "Evidence is irrelevant, however, if it leads only to speculative inferences." (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)

Although we agree that Ruiz's ability to send digital messages the night of the 2016 offense was plainly relevant, we discern no abuse of discretion in the trial court's determination that the investigator's 2020 findings were insufficiently probative of the status of WiFi when the shooting took place.  The trial court reasonably concluded that the investigator's testimony was irrelevant to the disputed issues at trial.

The crimes took place in October 2016 and the evidence sought to be admitted by Ruiz related to the availability of WiFi in January 2020, more than three years later.  And Meeker opined that the phone could have employed another cellular device for WiFi

7

access.[2]  The Pinger account associated with Ruiz could have therefore exchanged text messages when connected to WiFi by a variety of means; either he was connected to WiFi over an unsecured, publicly available network connection, or the phone had access to the Internet through some other "data port," including through another cell phone.  The availability of WiFi is not static, and the variables to be considered are numerous.  That an unsecured, public connection to WiFi was not discovered by an investigator at 17 spots near the park in January 2020—neither suggests nor dispels the idea that Ruiz's phone was able to connect to WiFi or that Ruiz had an available "data port" from which to tether to at or near Dove Hill Park in 2016.

Ruiz suggests on appeal that unsecured WiFi "was likely more prevalent" in 2020 than in past years but provides no basis for this proposition.  His trial counsel would have to invite the jury to speculate that all those who in October 2016 controlled any WiFi networks within range of the park would have been no less motivated or scrupulous about securing those networks against unidentified users than those who controlled available WiFi networks by the time of trial.

The court was not obliged to admit evidence that would require this speculative inference.  (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 212–213 [no abuse of discretion in denying defense motion to visit scene of crime because trial court "correctly reasoned that lighting and foliage conditions at the scene might be different than those prevailing at the time of the offense]; see also *People v. Lawley* (2002) 27 Cal.4th 102,

---

[2] Ruiz argues that Meeker's testimony about tethering to another cellular device was contradicted by the expert testimony that Ruiz's phone needed a WiFi connection to send and receive messages.  We disagree—we understand Meeker's testimony to be that a WiFi-enabled phone without cellular service may use another phone as a WiFi hotspot, providing the necessary WiFi connection.  And were these witnesses' testimony in conflict, " 'it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Mumin* (2023) 15 Cal.5th 176, 202 (*Mumin*).)

158 [when trial court considers whether jury should view crime scene, it may properly consider " 'whether the conditions for the jury view will be substantially the same as those under which the witness made the observations' "].)

The evidence sought to be introduced would lead only to speculative inferences about the availability of WiFi in 2016, minimizing its probative value. To the extent that the trial court appeared to grant that the proffered evidence had some probative value, if only "very little," we address Ruiz's contention that the court erred in excluding the evidence as substantially more prejudicial than probative under Evidence Code section 352. So framed, we still discern no abuse of discretion.

S.C. had already testified that she did not believe WiFi was available to Ruiz when he was at the park, and the prosecutor acknowledged this. Indeed, during closing argument, Ruiz's counsel highlighted this part of S.C.'s testimony and the absence of any contrary evidence on this point. Given the trial court's observation that the timing of this component of the defense investigation would deny the prosecution any opportunity to meaningfully test the evidence, it acted within its discretion to exclude cumulative evidence of questionable probative value. A trial court only exceeds its discretion if it acts in " ' "an arbitrary, capricious, or patently absurd manner that result[s] in a manifest miscarriage of justice." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) No such manifest miscarriage of justice has been shown here.

And because the evidence had at best minimal probative value, we find no merit in Ruiz's related contention that the exclusion of evidence impaired his constitutional right to present a defense. The "general rule [is] that the application of the ordinary rules of evidence under state law" does not violate a defendant's right to present a defense, "because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial." (*People v. Abilez* (2007) 41 Cal.4th 472, 503.)

**B.      *Juror Misconduct***

Ruiz relatedly argues that the jury committed prejudicial misconduct by speculating about his access to WiFi at the park based on matters not in evidence. Because the jurors merely relied on their common experiences during deliberations, we find no misconduct.

**1.      *Additional Background***

Following the jury's verdict, Ruiz filed a motion for a new trial, in part arguing that the jury had considered matters not in evidence because the availability of WiFi connections at Dove Hill Park had been discussed during jury deliberations. Attached to the new trial motion was a report from a defense investigator who interviewed a juror, M.L., who told the investigator that the availability of WiFi was discussed "a few times" and that the jurors had "agreed there was a possible connection somewhere from a residence, or possibly even a homework center at the school nearby." Another juror, R.M., also spoke with the defense investigator, who reported that R.M. recalled that the deliberating jurors discussed the availability of WiFi and that jurors had "discussed that the other defendant had an active cell phone plan, and [Ruiz] could have used a hot spot type situation, like on his phone," that "there being a school right there [near the park], and some schools do have wi-fi in this area," and that the park being in a residential neighborhood meant that "there's really often open wi-fi connections all around." Ruiz filed a motion requesting juror identifying information, arguing that a prima facie showing of juror misconduct had been made and that he needed the additional disclosure to investigate and bolster his claims.

The trial court denied both of Ruiz's motions, noting that "[t]he discussion about the fact that another phone can be used as a hotspot is a common knowledge piece of information that . . . jurors have," that the discussions about the possibility of WiFi at a nearby school were not misconduct, and nothing suggested that "facts were inserted based on a juror's knowledge beyond simple discussion of the issue generally."

## 2. *Legal Principles and Standard of Review*

Under section 1181, a defendant may move for a new trial on several different grounds, one of which is that the jury received any evidence out of court. (§ 1181, subd. 2.) When reviewing the trial court's denial of a motion for new trial based on juror misconduct, we accept a trial court's factual findings and credibility determinations, including as to whether misconduct occurred, "if they are supported by substantial evidence," but we exercise "independent judgment to determine whether any misconduct was prejudicial. [Citations.] . . . [Citation.] Juror misconduct raises a rebuttable presumption of prejudice; a trial court presented with competent evidence of juror misconduct must consider whether the evidence suggests a substantial likelihood that one or more jurors were biased by the misconduct." (*People v. Dykes* (2009) 46 Cal.4th 731, 809; *People v. Tafoya* (2007) 42 Cal.4th 147, 194–195 [finding that substantial evidence supported trial court's finding that no misconduct occurred].)

## 3. *Analysis*

"A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' " the latter of which is misconduct. (*People v. Steele* (2002) 27 Cal.4th 1230, 1266 (*Steele*).) The line here was not crossed. Cell phones and other personal electronic devices are prevalent, and the use of such devices and their limitations—including by logical extension whether WiFi may be publicly available to use with a personal electronic device—is a subject of common experience. (See, e.g., *People v. Yeoman* (2003) 31 Cal.4th 93, 162 [no misconduct when jurors discussed personal experiences with drugs during deliberations as the effect of drug use "has become a subject of common knowledge among laypersons"]; *People v. Fauber* (1992) 2 Cal.4th 792, 838–839 (*Fauber*).) For example, when asked by the court why the defense had not investigated earlier the available WiFi networks, Ruiz's counsel relied on what he considered common knowledge in explaining to the court, "I didn't

11

think we needed this type of evidence" because "[t]his to me . . . was a no-brainer. There's no WiFi at the park." The trial court likewise invoked "common knowledge" that the status of WiFi networks can "change quite often."

We similarly cannot expect jurors to completely disregard their general experience with pervasive wireless technology: " 'Jurors are not automatons. They are imbued with human frailties as well as virtues.' " (*Steele*, *supra*, 27 Cal.4th at p. 1266.) Indeed, " ' "[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors." ' " (*Fauber*, *supra*, 2 Cal.4th at pp. 838–839.)

Ruiz argues that the only competent evidence about WiFi in Dove Hill Park introduced into evidence was S.C.'s testimony that no WiFi was available, and the jury's consideration of the possibility that WiFi was available from sources like the neighboring school thus contravened the court's directive given in CALCRIM No. 200 to decide what happened "based only on the evidence that has been presented to you in this trial." But the jury was not required to accept S.C.'s uncontradicted testimony about the availability of WiFi. S.C.'s testimony was focused on her personal knowledge. It is the exclusive function of the trier of fact to determine what testimony it considers reliable and what reasonable inferences to draw from that testimony. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

Ruiz also argues that jurors could only have relied on their common experience if the prosecution had presented affirmative evidence that there *were* publicly available WiFi networks in the area. But Ruiz essentially "incorrectly suggests misconduct occurs whenever the jury, though instructed to consider only the evidence before it, nonetheless discusses speculative, irrelevant, and/or erroneous facts or opinions." (*People v. Pride* (1992) 3 Cal.4th 195, 267–268.) None of the interviewed jurors suggested that any jurors purported to hold themselves as having expertise regarding WiFi connectivity or that any juror had personally investigated or otherwise had personal knowledge of whether WiFi

12

was available at the park.  (Cf. *People v. Vigil* (2011) 191 Cal.App.4th 1474, 1484 [jury cannot " 'conduct a new investigation going beyond the evidence admitted' "].)  The jurors were merely using their common experiences with WiFi to infer that wireless connections *may* be available at certain public spaces in weighing the logic of Ruiz's alibi theory.  (See *Pride*, at pp. 267–268 [no misconduct when jury discussed possibility of escape from prison during penalty phase of capital trial].)

For the first time in his reply brief, Ruiz argues that the prosecutor improperly asked the jurors to speculate on the availability of WiFi, despite the trial court's exclusion of Ruiz's evidence that WiFi was unavailable at least as of the trial date.  (See *People v. Daggett* (1990) 225 Cal.App.3d 751, 758 [misconduct for prosecutor to ask "jurors to draw an inference that they might not have drawn if they had heard the evidence the judge had excluded"].)  Ruiz forfeited this argument by not raising it in his opening brief.  (*People v. Peevy* (1998) 17 Cal.4th 1184, 1206 ["a contention may not be raised for the first time in a reply brief"].)  And even assuming the issue has not been forfeited, Ruiz cannot point to any part of the prosecutor's closing argument that was patently inappropriate.  In rebutting Ruiz's alibi theory, the prosecutor argued that the Pinger usage did not "exclude[] the possibility he was there" at the park because the records did not disclose "if that app is activated on any other phone or if that phone is with some other person or anything."  The prosecutor's argument thus focused not on WiFi networks or their availability at the park but on the device that was used to send and receive the Pinger messages.  We take the prosecutor to be arguing that Ruiz could have used his Pinger account on someone else's cellular phone at the park, that someone else could have used Ruiz's account from elsewhere, or that there were other means by which Ruiz's phone might have been able to send and receive messages.  The prosecutor's closing argument was not misconduct.

## C.     *Testimony about Ruiz's Recorded Statements*

Ruiz next argues that the trial court prejudicially erred by permitting the investigating officer, Detective Meeker, to testify based on his review of surveillance video of Ruiz alone in an interrogation room that Ruiz could be heard saying " 'snitch bitch,' " " 'murder weapon,' " and " 'glove,' " among other statements.  "Under the secondary evidence rule, the content of a writing may . . . be proved either 'by an otherwise admissible original' [citation] or by 'otherwise admissible secondary evidence.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 269; Evid. Code, §§ 1520, 1521, subd. (a).)  But subject to exceptions inapplicable here—and "[e]xcept as otherwise provided by statute, oral testimony is not admissible to prove the content of a writing." (Evid. Code, § 1523, subd. (a).)[3]  A video tape is a writing for the purposes of the secondary evidence rule.  (*People v. Gonzalez* (2021) 12 Cal.5th 367, 410.)  Although we agree with Ruiz that some of Meeker's testimony was erroneously admitted secondary evidence of Ruiz's statements, we find any error harmless.

### 1.     *Additional Background*

Ruiz's counsel had objected after an Evidence Code section 402 hearing to Meeker "giving his opinion of what was said in that room" by Ruiz on the surveillance video.  Asked to clarify whether Meeker had "heard what was being said at the time it

---

[3] The exceptions include when "the proponent does not have possession or control of a copy of the writing and the original is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence" (Evid. Code, § 1523, subd. (b)), "the proponent does not have possession or control of the original or a copy of the writing and either of the following conditions is satisfied:  [¶]  (1) Neither the writing nor a copy of the writing was reasonably procurable by the proponent by use of the court's process or by other available means.  [¶]  (2) The writing is not closely related to the controlling issues and it would be inexpedient to require its production" (*id.*, subd. (c)), and when "the writing consists of numerous accounts or other writings that cannot be examined in court without great loss of time, and the evidence sought from them is only the general result of the whole" (*id.*, subd. (d)).  None of the parties argued below that any of these exceptions applied.

was being said," the prosecutor replied that Meeker had "both listened to [the statements] live and listened to [the statements] later." The trial court thereafter deemed admissible Meeker's testimony on what he had contemporaneously heard but invited Ruiz's counsel to present the recording to the extent it was inconsistent with Meeker's account.

Before the jury, however, Meeker admitted that although he occasionally monitored Ruiz by video in real time, he "didn't sit there and watch . . . from the moment [he] walked out of the room until the point in which [Ruiz] was booked at the Santa Clara County jail." Meeker stated that he heard Ruiz make several statements while in the room, both "in real time" and upon his later review of the recording. Meeker acknowledged that some words he interpreted only after watching and replaying the video several times. Meeker heard Ruiz say, "snitch bitch," "murder weapon," and "glove," along with several other unintelligible statements. Neither the prosecution nor the defense moved to admit the actual recording into evidence.

### 2. *Analysis*

"[W]hen one testifies as to what he has seen or heard, his testimony is primary evidence regardless of whether or not the same matter is reduced to writing or incorporated in a sound recording." (*People v. Johnson* (1974) 39 Cal.App.3d 749, 763.) But Meeker's testimony that he could only make out certain words from his later review of the recording rendered his testimony about those words inadmissible secondary evidence: it was oral testimony of what the writing contained. (See Evid. Code, § 1523.)

That Ruiz's statements were party admissions overcomes only the hearsay bar of Evidence Code section 1200. The hearsay exception for admissions of a party does not relieve the proponent of the evidence of other evidentiary rules. To the extent Meeker's knowledge of Ruiz's statements came not from hearing the statements as Ruiz made them

15

but from later listening to the recording, the secondary evidence rule rendered that testimony inadmissible under Evidence Code section 1523.[4]

But "state law error in admitting evidence is subject to the traditional [*People v.*] *Watson* [(1956) 46 Cal.2d 818] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error."  (*People v. Partida* (2005) 37 Cal.4th 428, 439; *Watson*, *supra*, 46 Cal.2d at p. 836.)  Even if Meeker's testimony about Ruiz's statements had been properly excluded, it is not reasonably probable that Ruiz would have received a more favorable verdict.

Meeker's testimony about Ruiz's statements was of limited probative value.  Although Ruiz contends that Meeker's testimony amounted to an "implied confession," it is unclear what inference the jury would necessarily have made from this evidence.  What Meeker described of Ruiz's statements amounted to isolated terms, not sentences recounting or acknowledging an action.  Meeker at trial acknowledged that the context of the words he recounted was unclear.  The jury was thus well aware that the meaning of the statements overheard by Meeker lacked context.

The words Meeker attributed to Ruiz thus paled in comparison to the direct evidence of Ruiz's guilt:  S.C.'s testimony established Ruiz's presence at the scene, his DNA was inside of the glove found in the bush near the shooting, and ammunition with a headstamp matching ammunition found at the crime scene was found where Ruiz had been staying around the time of his arrest.

Accordingly, given the limited probative value of the statements and the overwhelming evidence of Ruiz's involvement in the fatal robbery, any error in the admission of Meeker's testimony was harmless.

---

[4] Based on our conclusion, we need not reach Ruiz's alternative argument that the statements were improper lay opinion.

16

**D.**    *Alleged Officer Bias Against Ruiz*

Ruiz next argues that the trial court prejudicially erred by prohibiting him from cross-examining Meeker about a conversation between Meeker and other officers that was recorded following Ruiz's police interview.  As the cross-examination would not have caused a reasonable jury to have a significantly different view of Meeker's testimony, we find no error.

### 1.    *Additional Background*

After interviewing Ruiz, several officers, including Meeker and Detective John Barg, conversed outside of Ruiz's presence.  The discussion veered in what Ruiz had been doing with his hand during the interview.

Barg:  "Dude, anybody that touched that guy's hand needs to fucking wash their hands.  After he was fucking doing this –"

Meeker:  "Yeah, I saw that."

Barg:  "Doing that.  The guy's fucking disgusting."

Meeker:  "Yeah, he needs (*)."

Barg:  "(*)."

Officer 1:  "I don't itch my balls as much as this guy does."

Officer 2:  "He doesn't have any balls.  He's touching his pussy."

Officer 1:  "(*) his schlong, dude."

Officer 2:  "(*)."

Meeker:  "All right."

After some additional discussion of Ruiz's claim that he had not been to Dove Hill Park in "months," Barg pointed out that Ruiz's DNA had been found on the glove, at which the officers commented on his credibility.

Barg:  "So he can't later on say that he was out there taking a walk."

Officer 2:  "He hadn't been there in two years?  Bullshit."

Officer 1:  "Two, three years."

Meeker: "He's fucking lying."

Officer 1: "He's not fucking that girl though. He was honest about that."

Officer 2: "It's the only thing he told the truth about."

After Meeker testified at trial, Ruiz's counsel made a record of an unreported sidebar, indicating that he had wanted to cross-examine Meeker about this conversation with fellow officers. Ruiz's counsel argued that the exchange showed that Meeker had an "attitude toward the proceedings" that was relevant to his credibility. The trial court, however, had ruled the proposed examination irrelevant because the statements counsel identified were largely not Meeker's but merely made in Meeker's presence. Ruiz's counsel did not identify any statement of Meeker's but argued that Meeker tacitly endorsed the offensive statements of the others by not objecting and continuing to participate in the discussion: "Being the individual who was in charge of these people [who] are making these statements in his presence shows . . . that [Meeker's] in agreement with those types of statements." This was, in counsel's view, "sufficient to provide an ample area of cross-examination."

### 2. *Legal Principles and Standard of Review*

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to test the credibility of adverse witnesses through cross-examination. (*Del. v. Van Arsdall* (1986) 475 U.S. 673, 678; U.S. Const., 6th Amend.) The Confrontation Clause does not prevent a trial court from restricting cross-examination of a prosecution witness under Evidence Code section 352. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 (*Quartermain*); see Evid. Code, § 352 [authorizing exclusion of relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury"].) But limiting cross-examination relating to the credibility of a prosecution witness violates the Confrontation Clause if "a reasonable jury might have received a significantly different

18

impression of the witness's credibility had the excluded cross-examination been permitted." (*Quartermain*, at p. 624.)

When the relevant facts are undisputed, we review de novo claims that implicate a defendant's constitutional right to confrontation. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.)

### 3.    *Analysis*

"Proof of a witness' bias or prejudice against the specific individual who is a party in the litigation is clearly admissible." (*In re Anthony P.* (1985) 167 Cal.App.3d 502, 508; Evid. Code, § 780, subd. (f).) But because of Meeker's limited participation in the conversation with the other officers—including the limited nature of his responses—the trial court did not abuse its discretion in excluding the evidence, even if relevant, as substantially more prejudicial than probative under Evidence Code section 352.

As the Attorney General notes, only a few select statements can be attributed to Meeker based on the transcript provided by Ruiz's counsel. Arguably, Meeker's response, "Yeah, [Ruiz] needs [(something inaudible)]" to Barg's statement that Ruiz was "fucking disgusting" suggests Meeker's agreement with Barg's assessment. But the source of Barg's "disgust" was specific to Ruiz's hygiene only, and Meeker neither elaborated nor said anything to imply this affected his approach to the investigation. Meeker's comment that Ruiz was "fucking lying" did not suggest bias or prejudice but an assessment about the evidence. While Meeker apparently said nothing to discourage the other officers' commentary, the transcript does not suggest that he was an active participant. The trial court therefore reasonably concluded that the probative value of Meeker's alleged personal bias against Ruiz was minimal. The trial court could have also reasonably concluded that cross-examination on this point would have risked confusion of the issues or required an undue consumption of time to clarify the respective investigative roles (if any) of each of the three other officers who participated in the conversation, to air their explanations for the comments deemed significant, to delve into

19

context that went untranscribed as unintelligible, and potentially to play the recording. It was therefore not an abuse of discretion to exclude this evidence under Evidence Code section 352.

Nor does it appear that a reasonable jury would have had a significantly different impression of Meeker's credibility if the trial court had permitted cross-examination about the exchange. (See *Quartermain*, *supra*, 16 Cal.4th at p. 624.) As we have explained, Meeker's own comments were limited and in context did not reflect bias or prejudice. As for the comments of the other officers, even assuming, as Ruiz does, that Meeker would have objected if he disagreed with the substance or tenor of their comments, we cannot find that a jury would have found Meeker's credibility to be significantly different in light of the conversation.

We therefore find no violation of Ruiz's right to confrontation in the trial court's limitation on cross-examination.

### E. *Instructions on Aiding and Abetting Liability*

The prosecutor's theory of the case was that Jimenez was liable for Ruiz's attempted murder of A.P. under aiding and abetting principles. Jimenez now argues that the trial court erred by refusing to modify CALCRIM No. 401, the standard instruction on aiding and abetting liability, because the instructions permitted the jury to convict him of attempted murder under an invalid theory without finding that he had the intent to kill. Jimenez also argues that the trial court erred in its response to the jury's questions about attempted murder and aiding and abetting liability. We find no error in the trial court's refusal to modify the standard instruction and further find no error in its supplemental instruction to the jury.

#### 1. *The Instructions*

Ruiz, joined by Jimenez, asked that the trial court in administering CALCRIM No. 401 specify that to be guilty of aiding and abetting the commission of a crime, a defendant must have "knowledge of the full extent of the criminal purpose of the

20

perpetrator" and that for specific intent crimes such as murder, attempted murder, and conspiracy, "this standard is only met if the People prove beyond a reasonable doubt that the defendant shared the specific intent of the perpetrator." (Boldface omitted.) The trial court declined.

The trial court instructed the jury with the standard language of CALCRIM No. 401: "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

Administering CALCRIM No. 600, the trial court instructed the jury that, to prove a defendant guilty of attempted murder, the People must prove: "1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt."

21

## 2. *Validity of the Instructions*

Jimenez first argues that the trial court erred by declining to modify CALCRIM No. 401 to specify that the jury could not convict him of attempted murder under aiding and abetting principles unless it found that he harbored an intent to kill. Reviewing de novo Jimenez's claim that the instructions incorrectly state the law (*People v. Posey* (2004) 32 Cal.4th 193, 218), we find no error.

Jimenez is correct that an aider and abettor to an attempted murder must harbor a specific intent to kill. " '[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea'—which here includes knowledge that the direct perpetrator intends to commit the crime . . . , 'and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 467.) As attempted murder requires the specific intent to kill, " '[t]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

Although Jimenez concedes that CALCRIM Nos. 401 and 600, as individually considered, accurately set forth the elements of aiding and abetting liability and attempted murder, he argues the instructions in combination fail to apprise the jury of the specific intent required of a direct aider and abettor. Not so. CALCRIM No. 401 instructs that an aider and abettor must know that the perpetrator intended to commit the crime—in this case, attempted murder—and that the aider and abettor *intended* to aid and abet the perpetrator in committing that crime. And CALCRIM No. 600 specifies that the perpetrator of attempted murder must intend to kill.

Jimenez argues that the generic wording of CALCRIM No. 401, which requires that the aider and abettor know that the perpetrator intended to commit "the crime" and that the aider and abettor intended to and did aid and abet the perpetrator's commission of "the crime" permitted the jury to consider only whether he intended to aid and abet the crime of robbery. But Jimenez's interpretation fails to consider that CALCRIM No. 401 begins by specifying that to prove a defendant is guilty of "a crime based on aiding and abetting *that crime*" (italics added), certain elements must be proven. A reasonable juror would have understood this instruction as applied to attempted murder to mean that to find a defendant guilty of *attempted murder*, he must have known that the perpetrator intended to commit *attempted murder* and that he intended to and did aid and abet the perpetrator's commission of *attempted murder.* (See, e.g., *People v. Johnson* (2016) 62 Cal.4th 600, 640–641 [finding that CALCRIM No. 401 would not have allowed the jury to base defendant's liability for first degree murder on the mental state of the actual shooter].) "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions." (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on a different point as stated in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)[5]

We recognize that the trial court would not have erred by granting Jimenez's request to modify CALCRIM No. 401: It would be a correct statement of law to pinpoint that an aider and abettor of attempted murder must have a specific intent to kill. But the trial court was not required to effectively give three versions of CALCRIM No. 401, one for aiding and abetting murder (for Ruiz), another for aiding and abetting attempted murder (for Jimenez), and a third for aiding and abetting robbery—each with identical

---

[5] The prosecutor made a belated—and ultimately rejected—attempt to argue a theory of natural and probable consequences during the jury's deliberations. But nowhere in the prosecutor's closing argument did he suggest that Jimenez could be guilty of attempted murder by aiding and abetting an attempted robbery.

language but specifying each of the perpetrator's crimes the jury must find the aider/abettor intended. A trial court need not issue instructions duplicative of those it has already given. (*People v. Ramirez* (2006) 39 Cal.4th 398, 470.)

We thus find no error in the trial court's instructions as to aider and abettor liability, nor do we find error in its refusal to modify CALCRIM No. 401.

### 3.     *Jury Questions*

Next, Jimenez argues that the trial court compounded the error he asserts in CALCRIM No. 401 by its response to the jury's questions about aiding and abetting liability.

#### a.     *Additional Background*

During deliberations, the jury submitted two questions to the trial court about aiding and abetting liability for attempted murder. In the first note, submitted on Friday, January 17 at 4:32 p.m., the jury asked, "[R]egarding the charge of attempted murder—did the defendant (Jimenez) have to actually know whether the perpetrator (Ruiz) intended to commit the crime? (Can the defendant be convicted without knowing the perpetrator intended to commit the attempted murder)?" At a hearing several days later when court was back in session on January 21, Jimenez's counsel suggested in part that the trial court direct the jury back to CALCRIM No. 401 "*and* with the addition that attempted murder requires intent to kill." (Italics added.) The trial court referred the jury back "to instructions No. 401 and 600" (some capitalization omitted) without additional clarification.

That same day, after the trial court had instructed the jury to consult CALCRIM Nos. 401 and 600 in response to their previous query, the jury submitted a second note asking: "Per instruction [No.] 401—aiding and abetting requirement #2[.] At what point did the defendant need to know when the perpetrator intended to commit the crime?

24

Before(?) / During(?) / After(?)"  The trial court responded "[b]efore or during."[6]

Making a record outside the jury's presence, Jimenez's counsel represented that she had asked the court to instruct that attempted murder required that both the perpetrator and the aider and abettor intend to kill and that the court had declined to include this in response to the jury's note.

### b.    *Legal Principles*

Because "[a]ll criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt,' " the trial court has a sua sponte duty to instruct the jury on all the essential elements of a charged offense.  (*People v. Merritt* (2017) 2 Cal.5th 819, 824.)  A failure to do so threatens the state and federal constitutional right to a jury trial.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.)  Moreover, if the jury during deliberations "desire[s] to be informed on any point of law arising in the case, . . . the information required must be given" by the trial court.  (§ 1138.)  The trial court "has 'a " 'mandatory' duty to clear up any instructional confusion expressed by the jury." [Citation.]' [Citations.]  This means that a trial court's response to a jury question can be erroneous even if it does not technically misstate the law."  (*People v. Fleming* (2018) 27 Cal.App.5th 754, 766.)

As with the trial court's initial instructions, the correctness of the trial court's response to a jury's request for supplemental instruction "presents a question of law that we review de novo."  (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.)  We examine the challenged instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the

---

[6] As indicated *ante*, the second element in CALCRIM No. 401 was that "[t]he defendant knew that the perpetrator intended to commit the crime."

25

instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*).)

### c. *Analysis*

The jury's questions about aiding and abetting liability reflect initial confusion as to whether Jimenez had to know of Ruiz's intent to commit attempted murder to be convicted as an aider and abettor to attempted murder. The question is whether the trial court erred by referring the jury back to CALCRIM Nos. 401 and 600, which instructed the jury that Jimenez would have to know that Ruiz intended to commit attempted murder, and then by later answering the jury's more specific question as to *when* Jimenez had to know of Ruiz's intent. We conclude as to both questions that it is not reasonably probable that the jury applied the answer in an impermissible manner, so no instructional error occurred. (See *Houston*, *supra*, 54 Cal.4th at p. 1229.)

Preliminarily, we find no error in the trial court's answer to the jury's first question about whether Jimenez needed to know of Ruiz's intent to commit attempted murder, which was to refer the jury back to CALCRIM Nos. 401 and 600. As we have explained, CALCRIM Nos. 401 and 600 accurately inform the jury: (1) that aiding and abetting liability requires that "[t]he defendant knew that the perpetrator intended to commit the crime" and that "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime (CALCRIM No. 401), and (2) that attempted murder requires that "[t]he defendant intended to kill that person" (CALCRIM No. 600). The jury instructions in combination provided that to convict Jimenez as an aider and abettor to attempted murder, the jury must find that Ruiz intended to kill A.P., that Jimenez *knew* Ruiz intended to commit attempted murder, and that Jimenez intended to aid and abet Ruiz in the commission of the attempted murder.

"Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from

26

the standard are often risky." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)  The trial court thus did not err by answering the jury's query about whether Jimenez was required to know of Ruiz's intent by directing the jury to the particular instructions that answered the question.

In fact, the jury's follow-up question—referencing CALCRIM No. 401 and asking *when* Jimenez was required to know of Ruiz's intent to "commit the crime"—suggests that the jury did as the trial court intended by rereading CALCRIM No. 401 and that in doing so the jury understood that Jimenez *was* required to know of Ruiz's intent to commit attempted murder.  The jury thus sought clarification only about *when* Jimenez was required to know of Ruiz's intent.

Aiding and abetting liability requires "proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560 (*Beeman*).)  Thus, an aider and abettor must know of the perpetrator's intent to commit the crime *and* commit the act constituting aiding and abetting with knowledge of this unlawful purpose.  (*Ibid.*)  "Because the aider and abettor is subject to the same criminal liability and the same potential punishment as the perpetrator, it is essential to distinguish the act and intent that constitute 'aiding and abetting' the commission of a crime, from conduct that will incur the lesser liability of an 'accessory' to the crime—defined as conduct by one who, '*after a felony has been committed*, . . . aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction, or punishment, having knowledge that said principal has committed such felony or has been charged with such felony.' " (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039 (*Montoya*).)

In asking *when* the aider and abettor should know of the perpetrator's intent— "Before(?) / During(?) / After(?)"—the jury did not specify whose act was the object of these three alternative prepositions.  Nor did the trial court, in replying "[b]efore or

27

during." Assuming the jury meant to ask whether the aider and abettor should know of the perpetrator's intent to commit the crime before, during, or after *the act constituting the aiding and abetting*, then the court's answer correctly instructed on the necessary joint operation of the aider and abettor's act and intent.

Aiding and abetting liability hinges on two acts, however—the aider and abettor's act of assisting the perpetrator *and* the perpetrator's ultimate commission of the crime. (*People v. Reyes* (2023) 14 Cal.5th 981, 990–991 [direct aiding and abetting is in part based on the combined actus reus of both the perpetrator and the aider and abettor].) True, an aider and abettor must know of the perpetrator's intent to commit the crime before or during the perpetrator's commission of the crime. (*Beeman*, *supra*, 35 Cal.3d at p. 560; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1065–1066; *Montoya*, *supra*, 7 Cal.4th at p. 1039.) But if the jury meant to ask whether Jimenez had to know of Ruiz's intent to kill A.P. before, during, or after *Ruiz*'s commission of the crime, then the court's technically correct answer did not also clarify that an aider and abettor must know of the perpetrator's unlawful purpose before committing the act that facilitates or encourages the direct perpetrator commits the crime. (See *Beeman*, at p. 560.) In other words, if the jury determined that Jimenez had assisted Ruiz by pointing his shotgun at Salas but realized only in the interval between his shooting Salas and Ruiz firing his handgun at the car that Ruiz intended to kill A.P., Jimenez did not commit the act constituting aiding and abetting with knowledge of Ruiz's murderous purpose and would not have aided and abetted attempted murder.

As the parties did not originally note the ambiguity of the jury's second question, we invited supplemental briefing on the proper interpretation of jury's question. Jimenez instead reiterated his argument that any confusion lay in whether it was robbery or attempted murder that was "the crime" referenced in CALCRIM No. 401, which we have rejected (Ruiz did not respond). (See *ante*, part II.E.2.) We thus understand Jimenez to waive any claim that ambiguity in the jury's follow-up question bears on the adequacy of

28

the court's response. " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) Although the trial court's answer to the jury's second question could have been more explicit, its answer was technically correct, and we do not judge it " ' " 'in artificial isolation,' but . . . in the context of the instructions as a whole and the trial record." ' " (*People v. Lemcke* (2021) 11 Cal.5th 644, 655.) Because the jury since its first question had apparently reread CALCRIM No. 401 and no longer expressed confusion over its other elements, appellants have supplied no basis to overcome the presumption that the jury followed the instructions as given. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30.). These required that the prosecution prove that "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime" and that "[s]omeone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime." The jury was also instructed with CALCRIM No. 251, which instructed that "[t]he crimes and other allegations charged in this case require proof of the union, or joint operation, of act and wrongful intent" and that to be convicted of attempted murder, the defendant "must not only intentionally commit the prohibited act or intentionally fail to do the required act, but must do so with a specific intent."

On this record, we find no merit in Jimenez's claim of instructional error: (1) The trial court's original instructions informed the jury it could not convict Jimenez of aiding and abetting attempted murder unless it found that Jimenez had the requisite intent when committing the prohibited act; (2) the court's response to the first question demonstrably clarified that knowledge of the perpetrator's lethal intent was necessary to an aider and abettor's specific intent; and (3) the trial court's answer to the jury's second question made adequately clear that knowledge of the perpetrator's unlawful purpose must, as a

component of the essential mens rea, be "before or during" the aider and abettor's act. Jimenez has supplied no basis to infer that "jurors with intelligence and common sense" could not comprehend the totality of the court's instructions and answers in context. (*People v. Coddington*, *supra*, 23 Cal.4th 529, 594, overruled on a different point as stated in *Price v. Superior Court*, *supra*, 25 Cal.4th 1046, 1069, fn. 13.)

Accordingly, it is not reasonably likely that the jury would have read the trial court's response to the second jury note, in combination with CALCRIM No. 401 as a whole, to conclude that an aider and abettor can commit the act constituting aiding and abetting without knowledge of the perpetrator's unlawful purpose. (*Houston*, *supra*, 54 Cal.4th at p. 1229; see also *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918; *People v. Hendrix* (2022) 13 Cal.5th 933, 944; *Harrington v. Richter* (2011) 562 U.S. 86, 111–112.)

Arguing that the trial court's answers were infirm, Jimenez relies on *People v. Loza* (2012) 207 Cal.App.4th 332, which is distinguishable. Unlike *Loza*, the trial court did not direct the jury merely to " ' "apply . . . the law as you have been instructed" ' " (*id*. at p. 349) but specifically pointed the jury to CALCRIM Nos. 401 and 600—the two instructions that explained the required elements of both aiding and abetting liability and attempted murder. (See *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212–1213 [no error when trial court referred jury to reread the instructional definition of malice when jury asked for clarification of implied malice], superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.)

Jimenez also argues that two juror declarations, submitted with his motion for a new trial, reflect that the jury had difficulty understanding the instructions on aiding and abetting liability and that neither juror understood that Jimenez needed to share Ruiz's intent to kill. But " ' "evidence of what the juror 'felt' or how he understood the trial court's instructions is not competent." ' " (*Steele*, *supra*, 27 Cal.4th at p. 1261; see also *People v. Sanchez* (1998) 62 Cal.App.4th 460, 476 [where "affidavit or declaration

30

suggests ' " 'deliberative error' in the jury's collective mental process—confusion, misunderstanding, and misinterpretation of the law," ' particularly regarding 'the way in which the jury interpreted and applied the instructions,' the affidavit or declaration is inadmissible"]; Evid. Code, § 1150, subd. (a).) So a jury's verdict cannot be " ' "impeached by inquiry into the juror's mental or subjective reasoning processes." ' " (*Steele*, at p. 1261.) We cannot rely on these juror declarations, which specifically discuss the jurors' mental state and processes, to find fault with the trial court's instructions.

In sum, the trial court did not err in its instructions to the jury, and we find no reasonable likelihood that the jury misapplied the court's supplemental instructions.

## F. *Instruction on Flight*

Over Jimenez's objection, the trial court instructed the jury with CALCRIM No. 372 on flight after concluding that there were "compelling arguments on both sides as to whether [the defendants' conduct was], in fact, flight or not" but that it was "up to [the jury] to determine if someone fled and, if so, the importance of that conduct." Jimenez now argues that the trial court prejudicially erred because there was insufficient evidence to support the instruction. We find no error.

### 1. *Legal Principles and Standard of Review*

A trial court has the sua sponte duty to instruct the jury on all general principles of law relevant to the issues raised by the evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 73.) But section 1127c *requires* a trial court to give a flight instruction "where evidence of flight . . . is relied upon as tending to show guilt" as follows: "The flight of a person immediately after the commission of the crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence." "CALCRIM No. 372 is merely a distillation of the instructional duty imposed . . . by . . . section 1127c." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 499; CALCRIM No. 372 [if a defendant

31

fled after commission of crime, "that conduct may show that (he/she) was aware of (his/her) guilt"].)

Generally, " 'a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." [Citations.] " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " [Citations.] "*Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 982 (*Smithey*).)

Section 1127c may require an instruction on flight if the evidence is sufficient to do so, but the trial court must also " 'refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' " (*People v. Saddler* (1979) 24 Cal.3d 671, 681.) " ' "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' " (*People v. Canizales* (2019) 7 Cal.5th 591, 609.) Generally, "[a] claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

### 2. *Analysis*

The evidence here supports an inference that Jimenez's post-crime movement was motivated by a consciousness of guilt. (*Smithey*, *supra*, 20 Cal.4th at p. 982.) When S.C. called Jimenez shortly after the shooting, she thought that he sounded like he was "walking fast" when she called him by phone. One neighbor's surveillance video recorded two men running around the time of the shooting. Although the jury could infer that Jimenez's departure from the crime scene was innocent, it was also reasonable to

infer that Jimenez and Ruiz left the scene quickly, perhaps while running, and that the defendants fled out of guilt and a desire not to be apprehended. (*People v. Bonilla* (2007) 41 Cal.4th 313, 328–329 [flight instruction proper where jury even if there were innocent explanation for conduct so long as guilt was a reasonable inference].)[7]

And assuming that a flight instruction had been erroneously given, any error would have been harmless under the standard of harmless error articulated in *Watson*, *supra*, 46 Cal.2d 818—that is, it is not reasonably probable that a result more favorable to Jimenez would have been reached by the jury. (*People v. Clem* (1980) 104 Cal.App.3d 337, 344–345 [applying *Watson* standard to erroneous instruction on flight].) The flight instruction "did not posit the existence of flight; both the existence and significance of flight were left to the jury." (*People v. Crandell* (1988) 46 Cal.3d 833, 870, abrogated on a different ground as stated in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365; see also CALCRIM No. 372.) The jury was instructed that flight "may show" that a defendant is aware of his guilt, but that it was up to the jury to decide the meaning and importance of any alleged flight and only to do so "[i]f" a defendant tried to flee. (CALCRIM No. 372.)

Jimenez argues that we must apply the more stringent harmless-beyond-a-reasonable-doubt standard for federal constitutional error described in *Chapman v. California* (1967) 386 U.S. 18 to our review of instructional error here, reasoning that the

---

[7] The cases cited by Jimenez on appeal are of no assistance to him. For example, in *People v. Crandell* (1988) 46 Cal.3d 833, the only evidence was that the defendant left the murder scene "to accomplish specific tasks and with the intent of returning to dispose of the bodies." (*Id.* at p. 869.) In *People v. Clem* (1980) 104 Cal.App.3d 337, the evidence was that the *victim* locked her car doors and drove away after the defendant left her in the car; "[c]ommon sense requires a realistic look at just who was fleeing from whom." (*Id.* at p. 344.) And in *People v. Watson* (1977) 75 Cal.App.3d 384, there was no evidence of the defendant's immediate post-crime movements—the First District thus held that "the mere fact of defendant's arrest nearly two days later and miles away from the crime scene—standing alone—is not evidence of flight that may support an inference of guilt." (*Id.* at p. 403.)

flight instruction relieved the prosecution of proving beyond a reasonable doubt an element of the charged offenses. But the California Supreme Court has repeatedly rejected this argument. (*People v. Mendoza* (2000) 24 Cal.4th 130, 180–181, superseded by statute on other grounds as stated in *People v. Brooks*, *supra*, 3 Cal.5th 1, 63, fn. 8; *People v. Boyce* (2014) 59 Cal.4th 672, 691.) We therefore assess any alleged error under *Watson* and, as stated above, find that if any error occurred, it was not prejudicial.

## G.    *Constitutionality of Section 3051, Subdivision (h)*

Both Ruiz and Jimenez were 19 years old at the time of the murder. Below and on appeal, both defendants argue that section 3051, subdivision (h), which bars those between 18 and 25 years old sentenced to LWOP terms from youthful offender parole hearings, is unconstitutional and violates equal protection principles, and that remand is thus required for a hearing under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

We agree with the trial court that the constitutionality of section 3051 as applied is not yet ripe for review. "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 (*Pacific Legal*).) Even those who were under the age of 18 when they committed an LWOP offense do not become entitled to a youthful offender parole hearing until their 25th year of incarceration. (§ 3051, subd. (b)(4).) Sentenced to LWOP terms in 2021 for offenses committed in 2016, neither Jimenez nor Ruiz has come close to the eligibility date. Thus the controversy is not "definite and concrete" and the " 'facts have [not] sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Pacific Legal*, at pp. 170–171.)

In contrast, courts have addressed similar equal protection challenges to denials of requests for a *Franklin* hearing or a section 3051 youthful offender parole hearing. (See *People v. Hardin* (2024) 15 Cal.5th 834, 840 (*Hardin*) [defendant filed postjudgment request for a *Franklin* hearing]; *People v. Briscoe* (2024) 105 Cal.App.5th 479, 486

[defendant who was convicted and sentenced to LWOP in 1998 moved for a § 3051 hearing in 2022], review denied Dec. 11, 2024, S287744 (*Briscoe*).)  In *People v. Williams* (2024) 17 Cal.5th 99, the California Supreme Court addressed an equal protection claim to section 3051's exclusion of One Strike offenders.  But there, the claim was raised on direct appeal from the judgment, on facts suggesting that there had been no request for a *Franklin* hearing.  (*Williams*, at pp. 112–113.)  Furthermore, the *Williams* court granted review to resolve (as only the high court can) a split in authority among the Courts of Appeal (*id.* at p. 113), and no such split in authority exists on the claim here (briefed before the First District Court of Appeal's decision in *Briscoe*).[8]

Crucially, none of the parties requested a *Franklin* hearing in the trial court, so there is no denial of a *Franklin* hearing for us to review.  Section 3051 was amended effective January 1, 2016, to require youthful offender parole hearings.  (Stats. 2015, ch. 471, § 1.)  And *Franklin* was decided in 2016—years before defendants' sentencing.  (*Franklin*, *supra*, 63 Cal.4th 261.)  Should either defendant have believed they were entitled to a hearing to present mitigating factors, they could have requested one.  (*People v. Medrano* (2019) 40 Cal.App.5th 961, 967.)  And should either defendant now believe that they are entitled to a *Franklin* hearing, the appropriate procedure would be to file a motion under section 1203.01 for the purpose of making a record of any mitigating

---

[8] In *Hardin*, *supra*, 15 Cal.5th 834, the California Supreme Court rejected a defendant's broader equal protection challenge to his denial of a youthful offender parole hearing.  Reasoning that "the Legislature could rationally balance the seriousness of the offender's crimes against the capacity of all young adults for growth, and determine that young adults who have committed certain very serious crimes should remain ineligible for release from prison," the high court concluded, "Hardin has not demonstrated that the Legislature acted irrationally in declining to grant the possibility of parole to young adult offenders convicted of special circumstance murder, even as it has granted youth offender hearings to young adults convicted of other offenses."  (*Id.* at p. 839.)  But the *Hardin* court did not "foreclos[e] the possibility of other as-applied challenges to the statute" (*ibid.*), and in *Briscoe*, *supra*, 105 Cal.App.5th 479, the Court of Appeal held that section 3051's exclusion of youthful offenders convicted of special circumstance felony-murder (§ 190.2, subd. (d)) violated equal protection principles.

35

youth-related evidence. (*Medrano*, at p. 968; *In re Cook* (2019) 7 Cal.5th 439, 446–447 [offenders with final convictions may file a motion under the authority of section 1203.01 for a *Franklin* hearing].) (At oral argument, the parties agreed that a trial court, at least presently, would be bound by *Briscoe* to grant such a request.)

## H. *Jimenez's LWOP Sentence and Gross Disproportionality*

As in the trial court, Jimenez individually challenges the constitutionality of his sentence for Salas's murder on the ground that LWOP is cruel and unusual punishment, both generally for felony murder and specifically as applied to him. "There is considerable overlap in the state and federal approaches" to " 'prohibit[ing] punishment that is "grossly disproportionate" to the crime or the individual culpability of the defendant.' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 733.) Whether a punishment is so disproportionate as to be cruel or unusual presents a pure question of law, but a reviewing court must view " 'the underlying disputed facts . . . in the light most favorable to the judgment.' " (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.) And under the doctrine of separation of powers, "a court should not lightly encroach on matters which are uniquely in the domain of the Legislature," including the definition of crimes and the determinations of the appropriate punishments. (*People v. Wingo* (1975) 14 Cal.3d 169, 174 (*Wingo*).) Although these legislative functions are subject to constitutional restraints, "the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively and unmistakably appears.' " (*Ibid.*) In our independent judgment, Jimenez has not met the "considerable burden" of demonstrating that life without the possibility of parole for felony murder is unconstitutionally cruel or unusual. (*Ibid.*)

### 1. *The Eighth Amendment*

The Eighth Amendment "prohibits the imposition of inherently barbaric punishments under all circumstances." (*Graham v. Florida* (2010) 560 U.S. 48, 59 (*Graham*).) And in death penalty cases, the Eighth Amendment imposes a "narrowing

36

requirement" that "States . . . limit the class of murderers to which the death penalty may be applied." (*Brown v. Sanders* (2006) 546 U.S. 212, 216.)  Jimenez's sole argument under the Eighth Amendment is that the felony-murder special circumstance (§ 190.2, subdivision (a)(17)) fails to meaningfully narrow the class of felony-murder defendants subject to a special-circumstance allegation.  Jimenez reasons that the Legislature's narrowing of felony-murder liability in Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437)[9] made first degree felony murder coextensive with the felony-murder special circumstance:  Every person liable for first degree felony murder is now subject to the felony-murder special circumstance.  But we have found no authority suggesting that the Eighth Amendment's narrowing requirement extends to LWOP sentences, nor has Jimenez supplied any.  (See also *Harmelin v. Michigan* (1991) 501 U.S. 957, 995–996 [no comparable requirement outside the capital context for " 'individualized capital sentencing doctrine' "].)  Because Jimenez received a LWOP sentence, we need not reach his contention that Senate Bill No. 1437's amendments to section 189 undermine the California Supreme Court's prior rejection of his argument in capital cases.  (See, e.g., *People v. Winbush* (2017) 2 Cal.5th 402, 488; *People v. Pollock* (2004) 32 Cal.4th 1153, 1195.)

## 2.  *Cruel or Unusual Punishment Under the California Constitution*

Where the Eighth Amendment prohibits cruel *and* unusual punishment, article I, section 17 of the California Constitution prohibits "[c]ruel *or* unusual" punishment, and

---

[9] Senate Bill No. 1437 added section 189, subdivision (e), which now states:  "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1)  The person was the actual killer.  [¶]  (2)  The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3)  The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (Stats. 2018, ch. 1015, § 3, p. 6675.)

this is "a distinction that is purposeful and substantive rather than merely semantic." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085.) We accordingly address the state prohibition separately from its federal analog.

### a. *Additional Background*

At sentencing, Jimenez's counsel noted that Jimenez had no adult criminal history and had met codefendant Ruiz while both were at the juvenile ranch. Moreover, counsel argued that Jimenez had acted irrationally—he had wanted to provide for his family and impress his father by committing the instant offense—but that he had now demonstrated "heartfelt remorse" about his actions. Jimenez's counsel underscored that Salas's killing was unintentional and a result of Jimenez's "impulsive age," rendering there no rational argument that Jimenez would presently pose a danger to society. Jimenez's counsel also asked the trial court to consider Jimenez's youthful age and that he had not yet matured beyond adolescence at the time of the crime.

The prosecutor argued in opposition, noting that the defense psychiatric reports relied on statements by Jimenez and his mother, when Jimenez's mother had helped Jimenez cover up his participation in the murder. The prosecutor further argued that characterizing Salas's murder as "accidental" overstated the jury's findings. The prosecutor argued that the robbery was planned: The group chose a target, lured him to the park, and Jimenez and Ruiz chose to use firearms in the robbery.

Distinguishing *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), on which Jimenez principally relied, the trial court rejected Jimenez's constitutional challenge to the sentence and imposed a LWOP sentence on his conviction for murder in count 1.

### b. *Legal Principles*

The California Supreme Court has described three "techniques" to determine whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment under the California Constitution. Under the first technique, courts may "examine[] the nature of the offense and/ or the offender, with particular regard to the

38

degree of danger both present to society." (*In re Lynch* (1972) 8 Cal.3d 410, 425 (*Lynch*).) The second technique identified in *Lynch* "compare[s] the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious." (*Lynch*, at p. 426, italics omitted.) If more serious crimes are "punished less severely than the offense in question, the challenged penalty is to that extent suspect." (*Ibid.*) And finally, the third technique requires "a comparison of the challenged penalty with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision." (*Lynch*, at p. 427, italics omitted.)

### c. *Circumstances of the Offense and Personal Circumstances*

As to the first *Lynch* technique, "courts are to consider not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*Dillon*, *supra*, 34 Cal.3d at p. 479.) And courts must also consider "the particular person before the court, and ask[] whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) Jimenez has not demonstrated that his LWOP sentence is grossly disproportionate based on the circumstances of the offense or his personal circumstances.[10]

---

[10] The trial court here acknowledged Jimenez's remorse, which it found to be genuine, and indicated that it supported the idea of Jimenez becoming eligible for parole. Given the court's rejection of the constitutional challenge to an LWOP sentence, however, we cannot construe the court's statements as a determination that Jimenez's sentence was *grossly* disproportionate to the offense.

We acknowledge that the jury's finding on the firearm enhancements suggests that the jury was not persuaded that Jimenez intentionally fired the shotgun, consistent with S.C.'s testimony that Jimenez was halfway in the car when A.P. started driving off and that Jimenez told her later that his firing was accidental. But there was evidence that Jimenez, Ruiz, and S.C. plotted together to commit robbery, selecting A.P. to be the victim and using S.C. to lure him to park where Jimenez and Ruiz would ambush him. S.C. also described Ruiz saying in Jimenez's presence after the shooting "that [Ruiz] told Jimenez that [shooting at the car] was what he was gonna do." Yet Jimenez, too, armed himself before the robbery. There was thus evidence from which it can be inferred that Jimenez was aware that this robbery presented a significant risk of harm or death and that he nonetheless participated and indeed fatally compounded that risk by bringing his own loaded shotgun and pointing it at Salas.

Jimenez analogizes his case to *Dillon*, *supra*, 34 Cal.3d 441. Dillon was a 17-year-old high school student when he was convicted of first degree felony murder and attempted robbery. (*Id.* at pp. 450–451.) Dillon and several friends went to a marijuana farm, arming themselves with weapons including guns. When the owner, armed with a shotgun, confronted the minors after one of the Dillon's "hapless friend[s]" accidentally discharged his shotgun twice (*id.* at p. 452), Dillon rapidly fired his weapon, killing the owner. (*Ibid.*)

Former section 189 then required that all felony murder must be adjudged as first degree murder with an attendant sentence of death, life in prison with the possibility of parole, or LWOP. (*Dillon*, *supra*, 34 Cal.3d at p. 477.) Considering the facts at hand— and noting the jury's repeated communications to the judge that "made plain, if it had not been for the felony-murder rule they would have returned a verdict of a lesser degree of homicide than first degree murder" (*id.* at p. 487)—the *Dillon* court concluded that the record reflected that the time of the offenses Dillon was an "unusually immature youth . . . [who] had no prior trouble with the law" and "was not the prototype of a hardened

40

criminal who poses a grave threat to society" (*id.* at p. 488). *Dillon* concluded that "[t]he shooting . . . was a response to a suddenly developing situation that [Dillon] perceived as putting his life in immediate danger" and that "because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." (*Ibid.*) *Dillon* further noted that the other six youths who participated in the crime received only "petty chastisements"—none of the others were convicted of any degree of homicide nor sentenced to state prison for any crime, five of the minors were made wards of the court, only one was detained in a juvenile education and training project while the rest were placed on probation and sent back home. (*Id.* at p. 488.)

The comparison with *Dillon* is a close one. We recognize that at 19 years old, Jimenez was approximately only two years older than Dillon at the time of the killing and that his still-young age tended to diminish his culpability. (See, e.g., § 3051 [permitting some youthful offenders under age 26 with youthful offender parole hearings].) Moreover, the evidence suggests that Jimenez fired only once and—at least according to S.C.'s testimony—perhaps accidentally at that. The qualitative factual assessment in *Dillon* was unique to the facts presented in the case, however—evidenced by the *Dillon* jury's obvious struggle with convicting Dillon of first degree felony murder; the apparent readiness to credit his claim that he fired a shotgun nine times in succession reflexively and without thinking; the sentencing court's apparent inference that it was "unusual[] immatur[ity]" that drove Dillon's leading an armed if youthful band persistently into confrontation with an intended victim known to be armed and bellicose. (*Dillon*, *supra*, 34 Cal.3d at p. 488.)[11] But our standard of review here requires us to draw all disputed inferences as to Jimenez and his killing of Salas in favor of the LWOP judgment.

---

[11] On the strength of these factual determinations, the trial court committed Dillon to the Youth Authority, until the Court of Appeal issued a writ of mandamus directing the

Respecting these constraints, we observe that Jimenez agreed to participate in an armed ambush of the unsuspecting A.P.—someone specifically targeted as unlikely to resist—that Ruiz had purportedly told Jimenez that he planned to use his handgun, and that Jimenez participated by not only bringing a shotgun but leaning into the car and training his weapon at an apparently unarmed bystander.  These circumstances distinguish his case from Dillon's.  Young as Jimenez was, he, unlike Dillon, "had reached the age of adulthood"—the significance of which his juvenile system involvement would have impressed on him—and nothing in the record suggests that he "manifested the unusual immaturity shown by [the defendant in *Dillon*]."  (*People v. Abundio* (2013) 221 Cal.App.4th 1211, 1219; see also *Roper v. Simmons* (2005) 543 U.S. 551, 574 ["[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood"]; *People v. Acosta* (2021) 60 Cal.App.5th 769, 772 [LWOP sentence for 21 year old on autism spectrum disorder not cruel and unusual punishment]; *People v. Edwards* (2019) 34 Cal.App.5th 183, 190–192 [functional equivalent of LWOP sentence not cruel and unusual sentence for 19 year old], disapproved of on a different point as stated in *People v. Williams* (2024) 17 Cal.5th 99, 137, fn. 12; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1030–1032 [LWOP sentence for 18 year old not cruel and unusual punishment].)  We cannot say these distinctions carry no weight.

To be sure, the psychological evaluation completed by Dr. Francesca Lehman on behalf of the defense discussed Jimenez's adverse childhood experiences, including "extensive trauma and instability during critical developmental periods, which clearly impacted his psychological and emotional development."  But Dr. Lehman made no individualized finding as to Jimenez's maturity or his capacity for reasoned risk assessment at the time of the offense.  (See also *People v. Mincey* (1992) 2 Cal.4th 408,

court to vacate that commitment as void, necessitating a sentence of life imprisonment. (*Dillon*, *supra*, 34 Cal.3d at pp. 486–487.)

476 [evidence of a defendant's below-average intelligence insufficient to make the sentence disproportionate to individual culpability]; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1343–1345 [not cruel and unusual punishment to impose death penalty on individual with mental and emotional deficits], abrogated on a different point as noted in *People v. Hardy* (2018) 5 Cal.5th 56, 100.)  Nor is this case like *Dillon*, where Dillon's codefendants all received light sentences and minimal criminal penalties—like Jimenez, codefendant Ruiz was also sentenced to a LWOP term.

The California Supreme Court has cautioned that the limitation of constitutional proportionality "will rarely apply to those serious offenses and offenders currently subject by statute to life-maximum imprisonment."  (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.)  Although the trauma Jimenez suffered as a child and his youth may well have impacted his psychological and emotional development and mitigated his culpability, the factual record does not permit us to deem the sentence so grossly disproportional as to offend constitutional principles.  "Some LWOP inmates may be more culpable than other LWOP inmates" but there is no requirement that sentences be so "finely calibrate[d]."  (*In re Williams* (2020) 57 Cal.App.5th 427, 438 (*Williams*).)

Jimenez nonetheless analogizes his case to *In re Nuñez* (2009) 173 Cal.App.4th 709, in which the Court of Appeal found that a minor defendant's LWOP sentence for a "nonhomicide, non-injury offense"—kidnapping for ransom—was "so freakishly rare as to constitute arbitrary and capricious punishment violating the Eighth Amendment."  (*Id.* at p. 715.)  But *Nuñez* is readily distinguishable:  The *Nuñez* defendant was a minor *and* his offense did not involve death or injury.  In contrast, Jimenez, though still young, was legally an adult when he agreed to the robbery scheme, arming himself with a firearm, and personally killed Salas.

Jimenez also argues that the nature of the killing and the facts surrounding the botched robbery render his sentence cruel and unusual punishment because "[t]he evidence showed that the shooting was accidental and unintentional."  But Jimenez

mistakenly conflates the jury's not true finding as to the firearms enhancement as a factual finding that he lacked intent. Many federal and California decisions have uniformly held that "a jury verdict acquitting a defendant of a charged offense does *not* constitute a finding that the defendant is factually innocent of the offense or establish that any or all of the specific elements of the offense are not true." (*In re Coley* (2012) 55 Cal.4th 524, 554.) Rather than constituting proof the discharge was unintentional, the jury's verdict demonstrates only that the prosecution had not proven this enhancement beyond a reasonable doubt, and we lack the record of post-verdict juror comments that permitted more favorable inferences in *Dillon*. In other words, the jury's general verdict does not reflect that the jury necessarily found that Jimenez did not intend to shoot, only that there is a reasonable doubt as to whether he did. And his conviction for attempted murder reflects that the jury found that he had the specific intent to kill at least as to A.P. (See *Mumin*, *supra*, 15 Cal.5th at p. 190 [implied malice insufficient for attempted murder as "*attempted* murder requires a specific intent to kill"].)

When comparing the punishment imposed with the offense and the defendant's personal circumstances, we must give " 'particular regard to the degree of danger both present to society.' " (*Dillon*, *supra*, 34 Cal.3d at p. 479.) Despite Jimenez's lack of a criminal record, the evidence adduced at trial was that he planned the robbery, helped select a victim, armed himself with the shotgun, and knew that his codefendant intended to shoot. Combined with the fact that Jimenez discharged his weapon, killing Salas, we do not find that he has met his "considerable burden" to show that his sentence is grossly disproportionate given the circumstances. (*Wingo*, *supra*, 14 Cal.3d at p. 174.)

### d.     *Comparison to Other Criminal Penalties in California*

Next, Jimenez argues that the second *Lynch* technique likewise supports his claim that his LWOP sentence is unconstitutional because it exceeds the 25 years to life that "the greater and more serious crime of premeditated first degree murder" would warrant. Although we understand Jimenez's rationale for presuming that killing another with

44

express malice and premeditation is more worthy of severe punishment than killing with implied malice in commission of certain serious felonies, the Legislature has singled out certain first degree murders as more serious than others. Thus, special circumstance murders have "the harshest penalties available under our penal system and are reserved for crimes of the most heinous nature." (*Williams*, *supra*, 57 Cal.App.5th at p. 436.) Jimenez can cite no authority for concluding that the Legislature's gradations between types of first degree murder make LWOP for murder in the commission of another serious felony grossly disproportionate as a matter of law. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 934 [collecting cases].)

### e.   *Comparison to Penalties in Other Jurisdictions*

Finally, Jimenez argues application of this third *Lynch* technique is unnecessary but that if we do consider it, "in other countries, a sentence greater than 20 years is exceedingly rare." Under the California Constitution, however, "the relevant comparison . . . is to *other jurisdictions within the United States*," and Jimenez makes no argument that his sentence is disproportionate to those imposed in other states. (*People v. Reyes* (2016) 246 Cal.App.4th 62, 89.) We therefore take this " 'as a concession that his sentence withstands [that] constitutional challenge' " under this aspect of *Lynch*. (*Reyes*, at p. 89.)

As discussed *ante*, the circumstances of Jimenez's offense, combined with his own personal circumstances, do not render his sentence grossly disproportionate. Jimenez planned the robbery along with Ruiz and S.C., brought a loaded firearm with him, and fired the fatal shot that killed Salas. This is simply not " 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.' " (*Ewing v. California* (2023) 538 U.S. 11, 30.)

### I.   *Cumulative Error*

Both Ruiz and Jimenez raise claims of cumulative trial error. "In theory, the aggregate prejudice from several different errors occurring at trial could require reversal

45

even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) But we have found only one error in the admission of Meeker's testimony about Ruiz's statements on the recording and found that error not to be prejudicial. As there are no other errors to cumulate, the defendants' claim of cumulative error must be rejected.

## J.      *Jimenez's Motion to Dismiss Under the Racial Justice Act*

Jimenez argues that he made a prima facie case under the Racial Justice Act (RJA) for dismissal of the felony-murder special circumstance (§ 190.2, subd. (a)(17)) on grounds of its racially disparate application. With utmost respect for the plausibility of his legal theory, we find the report on which he relied to be logically infirm and its authors' curation of the available data to omit—without explanation—necessary and apparently available information. The trial court appropriately denied Jimenez's claim without prejudice, and we discern no abuse of discretion in the denial of his day-of-sentencing alternative request to continue the sentencing hearing.

### 1.      *Section 745*

Section 745, subdivision (a)(3) entitles a defendant to relief under the RJA if two requirements are met: (1) "[t]he defendant was charged or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated"; (2) "*and* the evidence establishes that the prosecution more frequently sought or obtained convictions for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained" (italics added).[12] As applied to Jimenez, then, relief based on disparate impact will ultimately require a showing that (1) Jimenez

---

[12] Jimenez also relies on another provision of the RJA that targets race-based disparities in discretionary sentencing for a given charge. (§ 745, subd. (a)(4)(A) [defining violation where sentence imposed was "longer or more severe . . . than was imposed on other similarly situated individuals convicted of the same offense"].) But because the charging and adjudication of the special circumstance left the trial court no discretion to impose a sentence less than LWOP (see § 190.2, subd. (a)), his RJA claim under subdivision (a)(4)(A) is indistinguishable from his claim under subdivision (a)(3).

was charged with special-circumstance robbery-murder and subject to mandatory LWOP when non-Latinx defendants who committed robbery murder were not charged with the special circumstance, and (2) the special circumstance was pursued more frequently against robbery-murder Latinx defendants than against robbery-murder defendants of other races.

Convictions are " '[m]ore frequently sought' " if, among other factors, "the totality of the evidence demonstrates a significant difference in seeking or obtaining convictions . . . comparing individuals who have engaged in similar conduct and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity." (§ 745, subd. (h)(1).) Individuals are " '[s]imilarly situated' " if "factors that are relevant in charging and sentencing are similar and do not require that all individuals in the comparison group are identical." (§ 745, subd. (h)(6).) And "similar conduct" refers to the behavior of a person on a particular occasion, or the underlying facts of the crimes. (*Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 129 (*Mosby*).)

If "the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing." (§ 745, subd. (c).) A " '[p]rima facie showing' " is the production of "facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) [of section 745] occurred." (§ 745, subd. (h)(2).) "[T]he court does *not* ask if the defendant proffered facts sufficient to demonstrate actual entitlement to relief." (*Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 22, italics added (*Finley*).) "[A] 'substantial likelihood' requires more than a mere possibility, but less than a standard of more likely than not." (§ 745, subd. (h)(2).)

We review de novo whether Jimenez made a prima facie showing of a violation of section 745, subdivision (a). (Cf. *People v. Harden* (2022) 81 Cal.App.5th 45, 52.)

## 2.     *Jimenez's Showing*

Identifying as Latinx,[13] Jimenez based his RJA motion on a report prepared by a Ph.D./J.D. candidate and an attorney titled "Quick Facts:  LWOP vs. LIFE [S]entences in Santa Clara County, California."  The report (1) compared the racial demographics of those persons currently serving LWOP sentences in California with the racial demographics of Santa Clara County and (2) examined data as to patterns of charges common to those serving life sentences (apparently for any offense, not limited to murder cases) and those serving LWOP sentences.  Both aspects of the report and the data presented in support fail to advance Jimenez's claim.  The report does not meaningfully address who is similarly situated for purposes of disparate charging of any special circumstance allegation, let alone the felony-murder special circumstance, or what is necessary to gauge relative frequency of differential treatment.  (See § 745, subd. (a)(3).)

The report discloses that 2,867 persons currently serving LWOP sentences were between 18 and 26 years old at the time of their offenses.  Of these 2,867, more than one-third (1,073) are "Hispanic/Mexican."  Only one-seventh (or 405) are "Caucasian," though these numbers "increased significantly after age 26" to roughly approximate "expected representation based on overall demographics of race/ethnicity across Santa Clara County."  Jimenez also observes that adolescent Latinx offenders are "severely overrepresented" among offenders sentenced to LWOP in Santa Clara County, relative to the racial demographics of the county at large:

---

[13] Jimenez identified as Latinx in the trial court, and on appeal he sometimes uses the term "Hispanic" and the data that he cites employ the category "Hispanic/Mexican." To the extent he treats the terms as interchangeable, his claims do not require us to interrogate the differences among them.  Except when quoting the reported data or his arguments, we adopt the term "Latinx" to comport with Jimenez's self-identification.

**Figure 1: Santa Clara LWOPs (18-26 by Race)**

| | Number of Offenders | % of Offenders | % County Residents | |
|---|---|---|---|---|
| Hispanic/Mexican | 29 | 38.16 | 25 | |
| Black | 14 | 18.42 | 2.8 | |
| White | 12 | 15.79 | 30.6 | |
| Asian or Pacific Islander | 4 | 5.26 | 39 | |
| American Indian or Alaskan Native | 1 | 1.32 | 1.2 | |
| Other | 16 | 21.05 | 1.4 | |

Percentages of county residents by race taken from the US Census Bureau (2019)

To be sure, these data reflect disparate outcomes. (See, e.g., *Hardin*, *supra*, 15 Cal.5th 834, 901 (dis. opn. of Evans, J.).) And we assume that the demographics of the general population—without regard to system involvement—can provide a relevant benchmark for RJA claims. But the crux of Jimenez's challenge is that these disparate outcomes derive from disparities in *charging* a special circumstance that, once proven in conjunction with the underlying murder conviction, mandates LWOP as the minimum sentence for what would otherwise have been an indeterminate life sentence with the possibility of parole. Prosecutors cannot allege a section 190.2 special circumstance except when charging the life-eligible crime of murder. So given the narrow inquiry presented by Jimenez's challenge to his LWOP sentence, the "similarly situated" population (§ 745, subd. (h)(6)) is not the general population of the county but those charged with murder who in theory could also be susceptible to a special-circumstance allegation of some kind, even if not the special circumstance alleged here. So members of the general population who have no sentencing exposure at all cannot be considered to have engaged in similar conduct or to be similarly situated to Jimenez.[14] Although the racial demographics of the county at large could *become* relevant once a defendant were to establish special-circumstance charging disparities between similarly situated groups,

---

[14] To the extent that murder charging patterns (as opposed to special-circumstance charging patterns) could themselves reflect bias, this is not a claim that Jimenez or the authors make.

permitting assessment of the demonstrated charging disparity relative to the racial demographics of the county's general population (see, e.g., *Mosby*, *supra*, 99 Cal.App.5th 106, 116–117), on this record, unknown numbers in the general population of the county distort the comparison Jimenez and the report authors would have us make.

This brings us to the report's second, more ambitious, but also flawed argument.

The authors posit eight "types of patterns [of charges] in LWOP sentencing" and tabulated "how many offenders with the same [patterns of] charges were identified from a sample of offenders in the LIFE data for the state of California":

**Figure 5: Matched LWOP & LIFE Exploratory Analysis Results**

| | Category Description | Matched Offenders |
|---|---|---|
| Category 1 | 1 homicide charge only | 655 |
| Category 2 | 1 homicide charge + 1 attempted homicide charge | 214 |
| Category 3 | 1 homicide charge + 2 attempted homicide charges | 61 |
| Category 4 | 1 homicide charge + 1 other felony | 159 |
| Category 5 | 2 homicide charges only | 61 |
| Category 6 | 2 homicide charges + 1 attempted homicide charge | 14 |
| Category 7 | 2 homicide charges + 2 attempted homicide charges | 4 |
| Category 8 | 2 homicide charges + 1 other felony (i.e. robbery) | 10 |

This, they posit, "proves the disparate application of LWOP v. LIFE sentences for murder and attempted murder charges." But their curation of the data does not advance their hypothesis.

To begin, the "types of patterns" of charges the authors have defined do not reliably implicate an LWOP-triggering special circumstance. For example, the largest type (655 of 1,178, or 55.6 percent) was defined as "[one] homicide charge only"; the next largest type (214 of 1,178, or 18.1 percent) was defined as "[one] homicide charge + [one] attempted homicide charge." But because a homicide charge is necessary but not sufficient to qualify for a LWOP term, counting those defendants[15] convicted of homicide who are serving life sentences reveals nothing about whether these defendants are similarly situated to Jimenez in LWOP-eligibility.

With the third-largest type, "[one] homicide charge + [one] other felony" (159 of 1,178, or 13.5 percent), the authors come closer to a methodologically sound proxy for a generically charged felony murder. They do not, however, identify whether the "other felony" is among the felonies listed in section 190.2, subdivision (a)(17)'s felony-murder special circumstance (and not, for example, unlawful possession of a firearm). Yet the authors appear to have had that information, judging from an attached four-page sample of "cleaned" White offender data.[16] Nor do they identify whether the "other felony" is transactionally related to the homicide (or, for prima facie purposes, at least alleged to have occurred on the same date). Other reported categories involve multiple murders, but here too, neither Jimenez nor the authors have attempted to show or even allege that White defendants convicted of multiple murders were more frequently relieved of the associated special circumstance than similarly situated defendants of other races or ethnicities. (§ 745, subd. (h)(6) & (1).)

---

[15] This would be so even disregarding potential questions implicated by the authors' reliance on only a "sample of offenders." But the authors neither explain their sampling methodology nor provide a corresponding tabulation from a comparably selected sample of offenders in the LWOP data.

[16] And here too, the record does not disclose what the authors' cleaning of the data entailed.

Even overlooking these issues with the authors' methodology at the deliberately low prima facie threshold, neither the authors nor Jimenez have explained how their report or attached spreadsheet support an inference of disparate charging of an LWOP-triggering special circumstance, when they have sampled and quantified only the LIFE outcome data. Disparity in this context requires a comparison of (1) similarly situated offenders from various ethnicities (e.g., Latinx versus White) by reference to (2) special-circumstance charging eligibility. As we have explained, the authors have not attempted to show that their identified charging patterns are appropriate proxies for special-circumstance eligibility and have provided raw numbers only for a sample of only non-LWOP life sentences. And although the authors were able to sample offender data by race, they supplied only a sample of White offenders meeting their eight patterns of charges, omitting from their report a corresponding sample of Latinx offenders (or any other available ethnic or racial classification). Without a meaningful effort to compare groups, we are unable to infer that "the prosecution more frequently sought or obtained [LWOP-mandating special-circumstance murder] convictions . . . against people who share [Jimenez's] race, ethnicity or national origin" statewide, let alone in Santa Clara County. (§ 745, subd. (a)(3).)

Nor have Jimenez or the report's authors established that "defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated" were spared special-circumstance murder charges. (§ 745, subd. (a)(3).) Instead, the authors supplied a single anecdote: "Included were offenders so sentenced by Santa Clara County, like Randy McCrickard, who shot and killed Donnie while she was sleeping in her bed on March 28, 1988. McCrickard also shot 16-year-old Crystal. Santa Clara County Case No. 121945." Absent was an identification how McCrickard's offense qualified as special-circumstance murder, let alone special-circumstance robbery murder.

In short, the authors concluded (and Jimenez reasserts) that racial disparities existed in LWOP versus life sentences because some White offenders were sentenced to life for convictions that may also result in a LWOP sentence, even though the authors and Jimenez have made no attempt here to assess whether LWOP or life was "[m]ore frequently sought" with similarly situated offenders of different races or ethnicities. (§ 745, subd. (h)(1).)

This is inadequate.

For a statistics-based challenge to an LWOP sentence under section 745, subdivision (a)(3), we would expect at least as a starting point a reasoned examination of (1) those defendants who were charged with murder in the relevant period and region, (2) the subset of those charged with murder who were also charged with a special circumstance, and (3) the racial makeup of both the murder group and the special-circumstance subgroup, as compared with the general population. (Compare *Mosby supra* 99 Cal.App.5th at p. 129 with *id.* at p. 134 (conc. opn. of Menetrez, J.).) We express no opinion on whether the prima facie stage also requires similarity at a more granular level—in the type of special circumstance, type of predicate felony, or underlying facts. But a prima facie case for racial discrimination in the special-circumstance charging decision requires more than a showing that an undefined sample of White homicide defendants are serving sentences of life with the possibility of parole. Nor is it sufficient to show that the percentage of Latinx defendants in the LWOP population exceeds the Latinx share of the general population. There must be some effort to show the frequency with which those eligible for a special circumstance have been spared the charging of that allegation and how that frequency varies across racial lines. (§ 745, subd. (h)(1).) Accordingly, the showing here fails to engage with the RJA's "similarly situated" requirement. (§ 745, subd. (a)(3).) And even if White defendants in the reported data could be said to be similarly situated to Jimenez in their eligibility for a special circumstance that would trigger an LWOP sentence, Jimenez has not shown that

53

the prosecution *more frequently* alleged a special circumstance for Latinx defendants or for defendants of color more broadly. (*Ibid.*)

The most relevant comparison here would be the racial makeup of defendants sentenced to LWOP for a robbery murder compared with the overall racial makeup of those who have committed robbery murders. At the prima facie stage, we will assume without deciding that it suffices to define "similar conduct" more loosely—e.g., as concurrent convictions for murder and any other felony listed in section 190.2, subdivision (a)(17) (defining the felony-murder special circumstance), even if the data do not disclose whether the murder occurred in the commission of the listed felony. But even under this looser conception of similar conduct, Jimenez has not shown disparate charging based on the data presented. The report reflects that the authors possess CDCR data on "All Active Offenders in California Sentenced to LWOP ages 18-26 . . . , All Active Offenders in California Sentenced to LWOP ages 27 and older . . . , and All Active Offenders in California serving LIFE." The report further reflects that the data include racial and ethnic identification. So to support a prima facie claim, Jimenez could have included " 'reasonably available documentary evidence' " from which we could evaluate the authors' contention that Latinx defendants are more frequently charged with a special circumstance than similarly situated White defendants. (*Finley*, *supra*, 95 Cal.App.5th at p. 21.) But " ' "[c]onclusory allegations made without any explanations of the basis for the allegations do not warrant relief, let alone an evidentiary hearing." ' " (*Ibid.*) This principle extends to "expert declarations and statistical information" accompanying a motion filed under the RJA. (*Id.* at p. 22.)[17]

This case is distinguishable from *Mosby*, *supra*, 99 Cal.App.5th 106, where the Fourth District found that a capital defendant convicted of murder with a gun

---

[17] For example, amicus curiae point out that the report surmises that "[t]he evidence is also indicative of racial disparities." But this assertion is conclusory, as the data summarized by the report did not break down life and LWOP offenders by ethnicity.

54

enhancement and three special circumstances had made a prima facie showing of a section 745, subdivision (a)(3) violation in the prosecutor's pursuit of the death penalty. (*Mosby*, at p. 111.)

The *Mosby* defendant submitted multiple statistical studies to support his first motion under the RJA, addressing racial disparities in charging, sentencing, and imposition of the death penalty among defendants charged with murder, based on Riverside County charging decisions over several years. One study showed that while "only 20 percent of all murder defendants were African-American, they comprised 26 percent of those charged with special circumstances, 39 percent of those who received death penalty notices, and 36 percent of those who received death sentences"—all rates that were higher than their White counterparts—from January 2007 to July 2019. (*Id.* at p. 115.) Another study examined 689 murder cases in Riverside County from January 2016 to January 2022 for racial disparities, and found that Black defendants were charged with murder and special circumstances more frequently than White defendants, relative to their share of the relevant Riverside County population (*id.* at pp. 116–117). The Fourth District in *Mosby* concluded "that the statistical evidence of racial disparity" presented in the reports prepared by the defendant "was sufficient to show a prima facie case of racial disparity in the charging of the death penalty in Riverside County." (*Id*. at p. 131; but see *id*. at p. 130 [declining to determine if "mere statistical evidence . . . may be enough to make a prima facie showing under section 745"].)

Unlike *Mosby*, no substantial likelihood emerges from the statistical evidence here. We recognize that under section 745, subdivision (h)(1), evidence of frequency may include "nonstatistical evidence" and that "[s]tatistical significance is a factor the court may consider, but is not necessary to establish a significant difference." And we do not suggest that the statistical evidence produced and analyzed in *Mosby* sets the threshold for a prima facie showing under section 745, subdivision (a)(3). But the defect in Jimenez's evidence is not that his dataset is too small to be statistically significant or

55

that the data are not sufficiently specific: The authors of the report on which he relies plainly have a dataset from which they have extracted information—selectively—by defendant's race, age, sentence, and convictions. It is the threshold failure to identify— based on presumably available data on similar conduct—the similarly situated populations to be compared, and the failure to determine from analyzing those populations whether one is more frequently charged with the more serious charge, here the special circumstance. (§ 745, subd. (a)(3) & (4)(A).) The data here may be consistent with a possible RJA violation, but the substantial likelihood of a violation requires more than a "mere possibility" and more relevant disclosures from the dataset the authors possess than Jimenez has provided here. (§ 745, subd. (h)(2).)

We understand that the authors in analyzing the available data were preparing their report for use in more than one case, and that the superficiality of the analysis may be the result of attempting to serve too many purposes. But even recognizing the low bar for a prima facie showing under section 745 and accepting the data in the unverified "Quick Facts" report, we cannot conclude that Jimenez has demonstrated a "substantial likelihood" of a violation of the RJA. (§ 745, subd. (h)(2).) We thus find no error in the trial court's denial without prejudice of Jimenez's motion under the RJA.

### 3. *Continuance for Filing of a Discovery Motion*

When the trial court denied without prejudice Jimenez's RJA motion, Jimenez's counsel asked to continue the sentencing hearing to move to compel discovery under section 745, subdivision (d). We conclude the court in denying the requested continuance did not abuse its " ' "broad discretion to determine whether good cause exists to grant a continuance of the trial." ' " (*People v. Alexander* (2010) 49 Cal.4th 846, 934 (*Alexander*); see also § 1050, subd. (e) [providing for continuance "only upon a showing of good cause"].)

Good cause for a continuance requires a showing that " ' "counsel and the defendant have prepared for trial with due diligence." [Citation.] Such discretion "may

56

not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." ' " (*Alexander*, *supra*, 49 Cal.4th at p. 934.)[18]  Given the breadth of the trial court's discretion, " 'only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.' " (*Ibid.*)

Here, the jury returned its verdicts—including the special-circumstance finding—in January 2020, the RJA became effective January 1, 2021, and the sentencing hearing took place in August 2021.  Jimenez was represented by counsel during the entire seven-month period between the enactment of the RJA and the hearing.  Although counsel indicated at the sentencing hearing that she needed a continuance to prepare a discovery motion under section 745, subdivision (d), counsel did not state *why* such a continuance was needed, given that she had months to pursue a discovery motion and in fact was able to prepare a RJA motion in this timeframe.

At sentencing, Jimenez's counsel explained that the report authors had been receiving data from the CDCR "through the spring of this year" and that Jimenez's counsel himself did not receive the report until the week of the sentencing hearing.  But even accounting for the delay in the CDCR's submission of data, Jimenez's counsel could have earlier moved under section 745, subdivision (d) to obtain additional data, rather than rely on a generic and deficient report.[19]  (See, e.g., *People v. Sakarias* (2000)

[18] We distinguish good cause for a section 1050 continuance from good cause for discovery under section 745, subdivision (d) and express no opinion on the latter.  (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 159 [good cause for RJA discovery requires only a "plausible factual foundation, based on specific facts, that a violation of the [RJA] 'could or might have occurred' in [the defendant's] case"].)

[19] In his reply brief, Jimenez argues that "[d]efense counsel informed the court that they had requested the necessary data, but that request was denied."  We have found no such indication that defense counsel informed the court that her request for information was denied.  But the report on which Jimenez relied stated that "[t]heoretically, the District Attorney[] for Santa Clara County holds the charging information necessary,"

22 Cal.4th 596, 646–647 [no abuse of discretion to deny request for continuance to prepare motion for new trial where defense counsel had ample time to prepare and gave no explanation for why he had not used available time to prepare].) We do not fault Jimenez's counsel for her tactical judgment in gambling on the adequacy of the report and its analysis of the data, but having committed to that path, she has not demonstrated the due diligence necessary for us to find the denial of her day-of-sentencing request for a continuance to be error. (See *Alexander*, *supra*, 49 Cal.4th at p. 934.)

This case is distinguishable from *People v. Garcia* (2022) 85 Cal.App.5th 290, where counsel was appointed less than a week before the sentencing hearing. (*Id.* at p. 294.) Although counsel requested additional time to prepare and to argue matters under section 745, the trial court denied the request, recognizing that defense counsel "did not have 'time to really flesh out the statistics' " to demonstrate racial bias. (*Garcia*, at p. 295.) On appeal, the First District held that the defendant's counsel should have had a "reasonable opportunity to review the trial record and gather relevant information to prepare a motion for discovery under the []RJA" and the error was not harmless under any standard. (*Garcia*, at p. 297.) Unlike *Garcia*, Jimenez was represented by the same counsel throughout the proceedings, and, unlike the *Garcia* defendant's, Jimenez's counsel had time to prepare a discovery motion should she have wished to do so—either instead of or in addition to her reliance on the "Quick Facts" report. Counsel's tactical

___

and "[t]he Authors are informed and believe that the data has been requested but denied by the District Attorney, thereby necessitating CPRA litigation." At the hearing, Jimenez's counsel reiterated that the "author[s], who [are] responsible for the study, [have] requested that additional data and that they're waiting for that from the district attorney's office." Regardless, if upon review of the received data, defense counsel had believed that further discovery was necessary, Jimenez does not explain why defense counsel did not pursue a motion under section 745, subdivision (d) as opposed to preparing a motion alleging a violation of the RJA in the first instance.

judgment in relying on the report did not obligate the trial court to delay the sentencing hearing once counsel recognized the report was not as persuasive as she had anticipated.

Because Jimenez's counsel did not articulate a reason for her delay in seeking to prepare a discovery motion, we find no abuse of discretion in the trial court's conclusion that no good cause had been shown to warrant a continuance of the sentencing date. (See *Alexander*, *supra*, 49 Cal.4th at p. 934.)[20] For these same reasons, we find no merit in Jimenez's additional contention that denial of the continuance deprived him of the effective assistance of counsel and due process. (See, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 70 ["a trial court may not exercise its discretion over continuances so as to deprive the defendant or his attorneys of a reasonable opportunity to prepare"]; *Alexander*, at pp. 935–936 [rejecting claim that denial of continuance violated federal constitutional rights because trial court acted reasonably in its denial].)

## K.     *Jimenez's Parole Revocation Fine*

Finally, Jimenez argues that the trial court erred in imposing a $1,000 parole revocation fine under section 1202.45 because his LWOP sentence for count 1 means that he will not be facing a sentence that includes a period of parole. In *People v. Brasure* (2008) 42 Cal.4th 1037, the California Supreme Court considered and rejected a similar argument. In *Brasure*, the defendant was sentenced to death *and* determinate prison terms under section 1170. Noting that section 3000, subdivision (a)(1) provides that such

---

[20] On appeal as in the trial court, Jimenez identifies no barrier to pursuing his RJA claim after judgment. (See, e.g., *People v. Wilson* (2024) 16 Cal.5th 874, 960 [holding that defendant had not "demonstrated that any legal or practical obstacle will delay or prevent him from raising his extrarecord RJA claims through the usual means of a petition for writ of habeas corpus"].) Section 745, subdivision (b) expressly authorizes a defendant to file a petition for a writ of habeas corpus alleging a violation of the RJA. Under section 1473, subdivision (e), if such a petition is based on "new discovery provided by the state or other new evidence that could not have been previously known by the petitioner with due diligence," the petition "shall not be deemed a successive or abusive petition."

a term "shall include a period of parole" and section 1202.45, subdivision (a) applies "[i]n every case where a person is convicted of a crime and his or her sentence *includes a period of parole*" (italics added), the California Supreme Court determined that the fine was statutorily required. (*Brasure*, at p. 1075.)

*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, upon which Jimenez relies, is distinguishable because there, the defendant was sentenced to no determinate terms, only LWOP and an indeterminate life sentence: A parole revocation fine was therefore categorically inapplicable, not merely unnecessary. (*Id.* at pp. 1185–1186; see also *People v. McInnis* (2021) 63 Cal.App.5th 853, 866–867 [parole revocation fine inapplicable when defendant received LWOP term and a stayed term of life with the possibility of parole]; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819 [parole revocation fine inapplicable when defendant was sentenced to LWOP and indeterminate life term].)

Accordingly, we find no error with the trial court's imposition of a parole revocation fine.

## III. DISPOSITION

The judgment is affirmed as to both defendants Jimenez and Ruiz.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

GROVER, J.

*People v. Jimenez et al.*
H049356

Filed 7/3/25

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049356 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 216443) |
| v. | ORDER MODIFYING OPINION, CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| MARCOS ANTONIO JIMENEZ et al., | |
| Defendants and Appellants. | |
| | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 3, 2025, be modified as follows:

1. On page 53, the first sentence of the third paragraph starting with "For a statistics-based challenge…" is modified to read: "For a statistics-based challenge to an LWOP sentence under section 745, subdivision (a)(3), we would expect at least as a starting point an examination of (1) a clearly defined sample of those defendants who were charged with murder in the relevant period and region, (2) the subset of that sample who were also charged with a special circumstance, and (3) the racial makeup of both the murder group and the special circumstance subset, as compared with the general population."

---

[*] The opinion in the above-entitled matter is certified for publication with the exception of parts I.B, II.A through and including II.H, II.J.3, and II.K.

1

2. In the modification to the first sentence of the third paragraph on page 53, directly after "For a statistics-based challenge to an LWOP sentence under section 745, subdivision (a)(3)," the following is added as footnote 17: "We do not suggest that a challenge to an LWOP sentence under section 745, subdivision (a)(3) must be based on statistical evidence. (See § 745, subd. (h)(1).)" All succeeding footnotes are sequentially renumbered.

3. Also on page 53, the fifth sentence in the third paragraph starting with "There must be some effort …" is modified to read: "There must be some effort to show the frequency with which those whose charges suggest eligibility for a special circumstance were not subject to that allegation and how that frequency varies across racial lines. (§ 745, subd. (h)(1).)"

There is no change in judgment.

Permission to file attorney William Safford's late request for partial publication is granted. The opinion filed on June 3, 2025, was not certified for publication in the Official Reports. For good cause, it appears that the opinion as modified above should be partially published in the Official Reports. (Cal. Rules of Court, rules 8.1105 & 8.1110.) The opinion as modified is certified for publication with the exception of parts I.B, II.A through and including II.H, II.J.3, and II.K.

_____
GROVER, Acting P. J.

*People v. Jimenez et al.*
H049356

2

Trial Court:     Santa Clara Superior Court
                     Superior Court No.: 216443

Trial Judge:     Hon. Eric S. Geffon

Counsel:     Jennifer A. Mannix for Defendant and Appellant Marcos Antonio Jimenez.

                     Jeffrey A. Glick, for Defendant and Appellant Marco Antonio Ruiz.

                     William H. Shin, for Plaintiff and Respondent The People.

                     Office of The State Public Defender, Galit Lipa and Lisa M. Romo, for Amicus Curiae in support of Appellant Marcos Antonio Jimenez.

*People v. Jimenez et al.*
H049356

3